# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

Nº 07-CV-1717 (JFB) (ARL)

DANIEL DEFABIO, PATRICIA DEFABIO, AND MICHAEL RUSINSKY,

Plaintiffs,

VERSUS

EAST HAMPTON UNION FREE SCHOOL DIST., ET AL.,

Defendants.

## AMENDED MEMORANDUM AND ORDER
October 1, 2009

JOSEPH F. BIANCO, District Judge:

Plaintiffs Daniel DeFabio ("Daniel" or "D.D."), Patricia DeFabio ("Ms. DeFabio") and Michael Rusinsky ("Mr. Rusinsky") (collectively, "plaintiffs") bring this action, pursuant to 42 U.S.C. § 1983, against the defendants, alleging violation of Daniel's constitutional rights under the First and Fourteenth Amendments to the United States Constitution, including freedom of speech, freedom of association, due process and equal protection. Plaintiffs also claim the defendants slandered and libeled Daniel under state law, and committed other violations of state law. Plaintiff further asserts that defendants' actions caused Ms. DeFabio and Mr. Rusinsky to suffer humiliation, embarrassment, depression, mental anguish, anxiety, and other pain and suffering, and to expend money on education, travel, medical and mental health expenses in order to make themselves whole.

The claims relate to events at East Hampton High School on April 26, 2004, while Daniel was a sophomore at the school, and the school officials' decisions on that day, and in the time period that followed, with respect to Daniel. Specifically, plaintiffs allege that, on April 26, 2004, a racially offensive comment was falsely attributed to Daniel concerning the death of a Hispanic student and that the school violated his rights to freedom of speech and association by preventing him from proclaiming his innocence at the school over the public announcement system, at a school assembly, or by some other mechanism. Plaintiffs further allege that school officials' decision to

expel Daniel from the school – allegedly without notice, a proper hearing, or the ability to fairly confront his accusers – violated his procedural and substantive due process rights, as well as his equal protection rights.

Defendants now move for summary judgment. For the following reasons, defendants' motion for summary judgment is granted on the Section 1983 claims. The Court declines to exercise supplemental jurisdiction over any state claims and, thus, dismisses those claims without prejudice.[1]

I. BACKGROUND

A. Facts

The facts described below are taken from the parties' depositions, affidavits, exhibits and the parties' Local Rule 56.1 statements of facts. Upon consideration of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party. *See Capobianco v. City of N.Y.*, 422 F.3d 47, 54-55 (2d Cir. 2005).

During the school year of 2003-2004, Daniel was a tenth grade student at East Hampton High School. (Defendants' Local Rule 56.1 Statement of Facts ("Defs.' 56.1") ¶ 1.)[2] Ms. DeFabio is Daniel's mother. (Defs.' 56.1 ¶ 2.) Mr. Rusinsky is not Daniel's biological or adoptive father, and is not married to Ms. DeFabio, but he resides in the family home of Daniel and Ms. DeFabio, considers himself Daniel's stepfather, and was a parental authority with whom the school

could communicate concerning Daniel. (Rusinsky Dep. at 7, 13-19.)

On April 24, 2004, a Hispanic student from East Hampton High School was killed in a motorcycle accident. (Defs.' 56.1 ¶ 4.) The following Monday, April 26, 2004, was a day of mourning in East Hampton High School. (Defs.' 56.1 ¶ 4.) That morning, Daniel asserts that, as he was walking in the hall to his third period class, he heard a student say "one down, 40,000 to go," in an apparent reference to the student who died. (Daniel Dep. at 24.) According to Daniel, he (Daniel) then repeated this statement to another student, D.A. (Defs.' 56.1 ¶ 6; Daniel Dep. At 33.) Specifically, Daniel testified that he whispered "I just heard someone say 'one down, 40,000 to go'" to D.A. with his hand cupped around D.A.'s ear.[3] (Daniel Dep. at 34.) Throughout that day, word spread through school that Daniel was the originator of the "one down, 40,000 to go" comment. (Defs.' 56.1 ¶ 7.) For example, Ralph Naglieri, who was a guidance counselor and was in the auditorium that had been designated for students as an area where they could mourn, spoke with a student, S.U, and, S.U. was very upset and speaking loudly about a student in the cafeteria who had made a comment about Hispanic students. (Naglieri Dep. at 8-10.) S.U. advised both Naglieri and another school staff member that people were very upset over the comment and pointed Daniel out as the person who had made the comment. (*Id*. at 10-11.)

Also, during eighth period that afternoon, while Daniel was in the cafeteria celebrating

[1]

[2] Where only one party's Rule 56.1 statement is cited, the opposing party does not dispute that fact or has offered no evidence to controvert that fact.

[3] As noted *infra*, D.A. disputes that Daniel qualified the statement to him with "I just heard," and believed Daniel was the originator of the statement.

a friend's birthday, a group of 4 or 5 Latino students came up to him yelling about a racist comment. (Daniel Dep. at 39-41.) Daniel did not fully understand what they were saying, but one of them threw something at Daniel. (*Id.* at 41) Daniel then told them that he had done nothing wrong, and they walked away. (*Id.*) Daniel was scared and thought he was going to be beaten up. (Defs.' 56.1 ¶ 9.) A few minutes after this confrontation, Naglieri approached Daniel's table and "physically grabbed" him and told him, "come with me." (Daniel Dep. at 45-46.) Daniel did not resist because he was "pretty scared." (Defs.' 56.1 ¶ 10.)

Mr. Naglieri took Daniel to the nurse's office. Daniel had a sense that these incidents had to do with the "one down, 40,000 to go" comment. (Defs.' 56.1 ¶ 12.) Mr. Naglieri asked Daniel about the comment, and Daniel denied that he originated the remark. (Defs.' 56.1 ¶ 13; Daniel Dep. at 49-50.) Daniel explained to Mr. Naglieri that he overheard the statement being made by someone else and that he merely repeated it. (Defs.' 56.1 ¶ 14.) An Assistant Principal then came to the nurse's office and asked Daniel if he made the statement. Daniel said no. (Defs.' 56.1 ¶ 15.)

Daniel was in the nurse's office for about twenty minutes. (Daniel Dep. at 50, 54.) During this time, there were "a lot" of Latino students looking into the office through a window, which made Daniel uncomfortable and afraid. Daniel heard people outside yelling that they were going to kill him. (Defs.' 56.1 ¶¶ 16-17.) Principal Scott Farina called the police to escort Daniel from school, and Daniel "ran" out with an Assistant Principal and the police officer on either side of him. (Defs.' 56.1 ¶¶ 18-19; Daniel Dep. at 56-58.) As Daniel left, the Latino students he saw outside the nurse's office were still there,

and some were yelling in Spanish. (Daniel Dep. at 58-59.) People at school made threats that they would kill Daniel and bomb his house, making him even more frightened than before. (Defs.' 56.1 ¶ 20.)

Ms. DeFabio was informed that Daniel was being sent home from school because there were 150 students who wanted to knock down his door and beat him up. (Defs.' 56.1 ¶ 21.) That evening, Principal Farina did not tell Ms. DeFabio that he was suspended, but told her that he should stay home for a few days because it was not safe for him to return to school until the situation calmed. (Defs.' 56.1 ¶¶ 22-24.)

The parties dispute whether Daniel was suspended as of being sent home on April 26, 2004. Defendants contend that he was simply sent home for his safety at that point, and was not suspended. (Farina Dep. at 20.) Plaintiffs, however, contend that he was suspended, as he was removed from school and not permitted to return. (Pls.' 56.1 ¶ 24.) They further contend that the situation had calmed down by the time the police arrived at the school and, therefore, there was no need to send Daniel home. (Farina Dep. at 40.)

On Tuesday, April 27, 2004, Daniel prepared a letter proclaiming his innocence and asked Principal Farina if he could read it over the loudspeaker. (Defs.' 56.1 ¶ 25.) Principal Farina denied this request, stating that he thought it would make the students angrier and would cause more problems in the school. (Defs.' 56.1 ¶ 25.) Daniel also requested permission to read the statement at a school assembly, but this was also denied. (Defs.' 56.1 ¶ 26.)

The parties dispute whether an investigation into the issue was conducted

between April 26, 2004 and April 30, 2004. Defendants contend that Principal Farina conducted an investigation, in which he interviewed Daniel and several other students to get their recollections of what had occurred. (Farina Dep. at 20-21.) Plaintiffs point to the findings of the Commissioner of Education – namely, that "the principal admitted that his investigation did not include any subsequent interviews with D.D. after the day of the incident and there were no written reports of any investigation to substantiate the charges," to support their contention that no investigation was conducted. (Commissioner's Decision, dated August 7, 2006, at 5.)

On April 28, 2004, a meeting was held between Ms. DeFabio, Mr. Rusinsky, Principal Farina, guidance counselor Caryn Lieber, and Assistant Principal Michael Burns. Principal Farina advised that Daniel's continued absence was necessary in order to calm the situation. (Defs.' 56.1 ¶ 28.) At that time, Daniel had mixed feelings about returning to school – he wanted to in one respect, but he remained scared. (Defs.' 56.1 ¶ 29.)

On April 30, 2004, plaintiffs were advised that Daniel was being suspended from school for 5 days and that a Superintendent's hearing might be convened. (Defs.' 56.1 ¶ 30.) Between April 26, 2004 and May 7, 2004, plaintiff received a couple of threatening phone calls to his house and cell phone. (Defs.' 56.1 ¶ 31.) The voicemail left on his cell phone was in Spanish. (Defs.' 56.1 ¶ 31.) Principal Farina heard threats at the school that people were going to light Daniel's house on fire. (Defs.' 56.1 ¶ 32.) As a result, police stayed in the vicinity of Daniel's house for about a week after April 26, 2004. (Defs.' 56.1 ¶ 32.)

On May 7, 2004, a Superintendent's Hearing was held. (Defs.' 56.1 ¶ 33.) Two students, D.A. and N.C., testified against Daniel at the hearing. (Defs.' 56.1 ¶ 34.) At the hearing, D.A. attributed the offensive comment to Daniel and denied that Daniel prefaced the comment by saying "I heard someone say" and, thus, believed that Daniel was the originator of the comment. (Commissioner's Decision, dated August 6, 2006, at 5.) N.C. admitted that she did not hear the exchange between Daniel and D.A. (*Id*. at 6.) Daniel testified at the hearing and admitted he made the comment to D.A., but denied he was the originator of the comment; rather, he maintained that he had overheard the comment in the hallway and simply repeated it. (*Id*. at 5.)

The Superintendent found Daniel guilty of making the racist comment and suspended him from school for the remainder of the school year. (Defs.' 56.1 ¶ 35.) After the hearing, Principal Farina escorted Daniel to a meeting with twelve students representing the school's Latino community. (Defs.' 56.1 ¶ 36.) Daniel explained his version of events at the meeting and distributed a copy of the statement he had wanted to read over the loudspeaker. (Defs.' 56.1 ¶¶ 37-38.) According to Daniel, most of the students appeared not to believe Daniel's story and commented that the fact that Daniel did not make a statement earlier and did not return to school made it look like he was lying. (Daniel Dep. at 91.) Principal Farina explained to the students that he had not permitted Daniel to return to school and that he had denied Daniel's request to disseminate a statement explaining his version of events. (Defs.' 56.1 ¶ 40.)

Daniel was home tutored for the remainder of the school year. (Daniel Dep. at 100-101.)

The parties dispute when the tutoring began – defendants claim that Daniel was tutored beginning around May 3, 2004 (Defs.' 56.1 ¶ 41), while plaintiffs contend that tutoring began on May 10, 2004. (Daniel Dep. at 101.)

According to Daniel, that summer, Daniel received threats from various, unknown Latino individuals while he was working. (Defs.' 56.1 ¶ 48.) One of them almost came onto the boat Daniel was working on to fight him, but was stopped by the first mate. (Daniel Dep. at 97.) On a couple of other occasions, when Daniel was in the car, people would curse and yell at him and say they were going to kill him. (Defs.' 56.1 ¶ 49.) On one occasion, a Latino student saw him at a gas station and said Daniel was lucky he did not "pop" him. (Defs.' 56.1 ¶ 50; Daniel Dep. at 105.) Daniel never reported these incidents to the police. (Defs.' 56.1 ¶ 51.)

During the summer of 2004, Ms. DeFabio and Mr. Rusinsky met with Principal Farina to discuss Daniel's return to school. (Defs.' 56.1 ¶ 46.) Plaintiffs did not feel that the school was taking adequate measures to secure Daniel's safety, and, therefore, decided that he would have to leave the state to be safe. (Defs.' 56.1 ¶ 47; Pls.' 56.1 ¶ 47.) The parties dispute when the decision not to return to East Hampton High School was made by plaintiffs. Plaintiffs contend that Ms. DeFabio made the decision in August 2004. (Daniel Dep. at 107-08.) Defendants contend that plaintiff never expected to return to East Hampton High School during the summer of 2004. (Defs.' 56.1 ¶ 52.) According to the plaintiffs, they made the joint decision that Daniel should go to California to school for his own safety, based on threats that had been made in-person, over the phone and through third parties. (Defs.' 56.1 ¶ 53.)

Plaintiffs appealed the decision of the Superintendent to the East Hampton Board of Education, but the appeal was denied. (Defs.' 56.1 ¶ 42.) Plaintiffs then sought a reversal of the suspension and expungement of Daniel's record before the New York State Commissioner of Education. (Defs.' 56.1 ¶ 43.) The Commissioner sustained the appeal, overturned the Superintendent's decision and ordered that the incident be expunged from Daniel's student record. (Defs.' 56.1 ¶ 44.) The Commissioner explained that "the superintendent failed to discuss any facts or testimony of the witnesses and his decision does not demonstrate that he addressed or weighed their credibility or demeanor." (Commissioner's Decision, dated August 7, 2006, at 5.) Thus, the Commissioner concluded the following: "While I recognize the highly charged emotional atmosphere surrounding this event, and do not in any way condone the biased nature of the comment, under the circumstances of this case and the record before me, I am constrained to determine that the record does not contain sufficient and competent evidence that D.D. generated the offensive comment and thus engaged in the objectionable conduct as charged." (*Id.*)

## B. Procedural History

Plaintiffs filed a complaint in this action on April 25, 2007. On May 30, 2007, defendants filed an answer to plaintiffs' complaint. On November 10, 2008, defendants filed a motion for summary judgment. Plaintiff filed his opposition on January 7, 2009. Defendants filed a reply on January 20, 2009. Oral argument was held on May 28, 2009. The Court has considered all of the parties' submissions.

## II. SUMMARY JUDGMENT STANDARD

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir. 2006). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2004). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (internal quotations omitted); *Tufariello v. Long Island R.R.*, 364 F. Supp. 2d 252, 256 (E.D.N.Y. 2005). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (internal quotations omitted).

## III. DISCUSSION[4]

---

[4] As a threshold matter, although both Daniel and Patricia DeFabio have standing to sue, defendants challenge Michael Rusinsky's standing to sue in this action on the basis that he "has no legally recognized relationship with Daniel DeFabio." (Defendants' Memorandum of Law, at 8.) Plaintiffs contend that Mr. Rusinsky has standing because he has regularly resided in Daniel's household and, therefore, is considered "immediate family" under New York law. (Plaintiffs' Memorandum of Law, at 21.) However, it is undisputed that Mr. Rusinsky is neither a biological or an adoptive parent, nor is he married to Daniel's mother, and Mr. Rusinsky is not regarded as a step-parent by virtue of his relationship. *See Eckhardt v. Eckhardt*, 37 A.D.2d 629 (N.Y. App. Div. 1971). Thus, the Court agrees with defendants and concludes that mere residence in a household is insufficient to confer standing on Mr. Rusinsky to assert claims here. In any event, even assuming *arguendo* Mr. Rusinsky also had standing to sue, his claims would not survive summary judgment on the merits for the

A. The Underlying Section 1983 Claims

To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must show: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and laws; (2) by a person acting under the color of state law. 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993). Plaintiffs contend that defendants violated Daniel's constitutional rights to free speech, freedom of association, due process and equal protection. Defendants now move for summary judgment on the grounds that, based on the evidence in the record, no reasonable juror could find that defendants violated any of Daniel's constitutional rights. The Court will address each issue in turn.

1. Freedom of Speech Claim

Plaintiffs contend that defendants violated Daniel's First Amendment rights by denying him an opportunity to communicate his prepared statement to the student body in a number of ways. Specifically, plaintiffs contend that defendants should have allowed Daniel's statement about the April 26, 2004 events: (1) to be read over the school intercom system; (2) to be read at an all-school assembly in the auditorium; or (3) to be distributed to the students.

Defendants contend that because such speech required "the pulpit of the school's PA system and/or auditorium" or distribution by

school administration it would be "school-sponsored speech" and, therefore, may be censored "so long as censorship is reasonably related to legitimate pedagogical concerns" – in this case, a concern that such speech would "further incite an already tense situation" and "could foreseeably disrupt the student body and wreak havoc in the school." (Defendant's Memorandum of Law, at 11-12 (citing *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988)).) They note that plaintiff was not prevented from communicating with his peers via telephone, e-mail, or any other ordinary channel; "rather he sought for the school to provide him with the means and medium to communicate by either public address system or a school-wide assembly." (Defendant's Memorandum of Law, at 11.) Plaintiffs, however, contend that the appropriate standard to apply here is the one set forth in *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969), which states that student expression may be restricted where it "would substantially interfere with the work of the school," or would cause "material and substantial interference with schoolwork or discipline." *Tinker*, 393 U.S. at 511, 513. As set forth below, although plaintiffs made a number of requests that would constitute school-sponsored speech and be analyzed under *Hazelwood*, they also allege that (prior to any suspension) Daniel was prevented from returning to school and speaking to students without any assistance from the school. Thus, the school's decision is properly analyzed under the *Tinker* standard, rather than *Hazelwood*, and the undisputed facts demonstrate that defendants are entitled to summary judgment on this claim under *Tinker*.

a. Applicable Level of Constitutional Scrutiny

same reasons as the other plaintiffs, for the reasons discussed *infra*.

It is axiomatic that "[f]reedom to speak on government property is largely dependent on the nature of the forum in which the speech is delivered." *Bronx Household of Faith v. Cmty. Sch. Dist. No. 10*, 127 F.3d 207, 211 (2d Cir. 1997). Thus, when determining the level of constitutional scrutiny to be applied to state actions regulating speech, the court should first consider the threshold issue regarding the type of forum. *See Peck ex rel. Peck v. Baldwinsville Cent. Sch. Dist.*, 426 F.3d 617, 625 (2d Cir. 2005) ("Because the level of judicial scrutiny that must be applied to state actions inhibiting speech varies with the nature of the forum in which the speech occurs, we must first consider what sort of forum had been created . . . .").

There are "four categories [of fora for expression] that, correspondingly, fall along a spectrum of constitutional protection." *Id*. The categories from highest protection to lowest are the traditional public forum, the designated public forum, the limited public forum, and the non-public forum. *See Make the Road by Walking, Inc. v. Turner*, 378 F.3d 133, 142-43 (2d Cir. 2004). A school is generally a non-public forum, a place in which the government "does no more than reserve eligibility for access to the forum to a particular class of speakers, whose members must then, as individuals, obtain permission to use it." *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 679 (1998) (citation and internal quotation marks omitted); *see also M.B. v. Liverpool Cent. Sch. Dist.*, 487 F. Supp. 2d 117, 133 (N.D.N.Y. 2007) ("Generally, school facilities are nonpublic forums."). "School facilities may be deemed to be public forums only if school authorities have by policy or practice opened those facilities for indiscriminate use by the general public, or by some segment of the public . . .

. If the facilities have instead been reserved for other intended purposes, communicative or otherwise, then no public forum has been created . . . ." *Hazelwood*, 484 U.S. at 267 (internal citations and quotation marks omitted). "A 'designated public forum' is a place not traditionally open to public assembly and debate – a public school, for example – that the government has taken affirmative steps to open for general public discourse." *Peck*, 426 F.3d at 626. A limited public forum is created when the state "opens a non-public forum but limits the expressive activity of certain kinds of speakers or to the discussion of certain subjects." *Hotel Employees & Rest. Employees Union, Local 100 v. City of N.Y. Dep't of Parks & Recreation*, 311 F.3d 534, 545 (2d Cir. 2002).

The forum determines the type of constitutional scrutiny that applies to the restriction of speech. Speech in a public forum may only be restricted on the basis of content if "necessary to serve a compelling state interest and . . . narrowly drawn to achieve that end." *Make the Road by Walking*, 378 F.3d at 142. "Rules governing the content of speech in a limited public forum must be reasonable and viewpoint-neutral." *M.B.*, 487 F. Supp. 2d at 132. Courts will "uphold a governmental restriction on speech in a nonpublic forum as long as the restriction is reasonable and viewpoint-neutral." *Perry v. McDonald*, 280 F.3d 159, 169 (2d Cir. 2001).

Here, there is no question that the high school was a non-public forum. There is absolutely no evidence that the defendants, as it related to the events at issue in this case, opened the school facilities to use and expression by the public or some segment of the public. In fact, plaintiff does not even make such an assertion. Thus, the school is a

non-public forum in which content can be regulated in a reasonable manner. *See, e.g., Peck*, 426 F.3d at 626-27 (holding that school was a non-public forum).

However, further analysis is required in this case because the Supreme Court has also established specific standards for analyzing the level of constitutional expression afforded to students in the school environment, focusing on the nature of the speech, whether the speech is sponsored by the school, and the reasons for regulating it. Although students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," *Tinker,* 393 U.S. at 506, their constitutional rights "are not automatically coextensive with the rights of adults in other settings," *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986). Thus, the First Amendment standards need to be "applied in light of the special characteristics of the school environment." *Hazelwood*, 484 U.S. at 266 (citation and internal quotation marks omitted). In particular, the Supreme Court has analyzed different categories of school speech and applied separate standards of review to each category: (1) schools may prohibit student speech that is vulgar, lewd, indecent, or plainly offensive because "it is a highly appropriate function of public school education to prohibit the use of vulgar and offensive terms in public discourse," *Bethel Sch. Dist. No. 403*, 478 U.S. at 683-85; (2) schools may exercise editorial control over speech that is school-sponsored "so long as their actions are reasonably related to legitimate pedagogical concerns," *Hazelwood*, 484 U.S. at 273; (3) schools may "restrict student speech at a school event, when that speech is reasonably viewed as promoting illegal drug use," *Morse v. Frederick*, 551 U.S. 393, 403 (2007); (4) as to all other speech, the school cannot suppress based on content unless the school official reasonably concludes that the speech will "materially and substantially disrupt the work and discipline of the school," *Tinker*, 393 U.S. at 513. *See also Guiles ex rel. Guiles v. Marineau*, 461 F.3d 320, 325 (2d Cir. 2006) (summarizing First Amendment jurisprudence involving school speech).

In the instant case, there is no assertion that the speech at issue was offensive, nor was it related to drug use. Thus, none of the circumstances presented in *Bethel* or *Morse* are at issue here. However, in order to determine which standard applies, the Court must analyze whether the speech that plaintiff alleged was prohibited was school-sponsored speech. "The question whether the First Amendment requires a school *to tolerate* particular speech . . . is different from the question whether the First Amendment requires a school affirmatively *to promote* particular student speech." *Hazelwood*, 484 U.S. at 270 (emphasis added). Whether speech is deemed "school-sponsored" such that the *Hazelwood* standard applies, relies on a determination of whether the speech "'might reasonably have been perceived to bear the imprimatur of the school.'" *Romano v. Harrington*, 725 F. Supp. 687, 690 (E.D.N.Y. 1989) (quoting *Hazelwood*, 108 S. Ct. at 569). This includes "activities [that] may fairly be characterized as part of the school curriculum, whether or not they occur in a traditional classroom setting, so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences." *Hazelwood*, 484 U.S. at 270-71.

Here, plaintiffs assert that, after an article about the incident appeared in the East Hampton Star on April 29, 2004, Daniel

requested an opportunity to respond to the rumors by speaking to the students in one or more of the following manners: (1) have Daniel read his statement at a school assembly called in the auditorium; (2) have Daniel read his statement at the school to all students over the school's public announcement system; (3) have the school circulate a copy of Daniel's statement throughout the school to all students; or (4) allow Daniel to return to school and distribute his statement to students on his own (without school assistance) and/or speak to them about it during non-instructional time. Plaintiffs allege that defendants refused to allow him to return to the school to give the statement in any of these manners, including on his own without any school assistance. The Court will analyze each one of these issues in turn.

First, asking the school administration to call students into the auditorium to listen to Daniel read his statement at a school assembly during school hours on school property might reasonably have been "perceiv[ed] to bear the imprimatur of the school." *Hazelwood*, 484 U.S. at 281. Therefore, such speech constitutes school-sponsored speech. *See, e.g., Poling v. Murphy*, 872 F.2d 757, 762 (6th Cir. 1989) (finding an election assembly to be "school-sponsored" where the school scheduled the assembly during school-hours on school property, and "made attendance compulsory").

To the extent that plaintiffs contend that Daniel merely wanted to use the auditorium with no assistance from the school administration, the school auditorium was a non-public forum to which Daniel had no right to access on that basis. Plaintiffs have pointed to no evidence that the school had previously allowed the use of a school assembly indiscriminately by the general public, or even by individual students or student groups. Plaintiffs suggest that some type of public forum was created by the school because they had a grieving session in the school auditorium on April 26, 2004 regarding the student's death (at which students spoke about the racially charged comment attributed to Daniel) and, thus, Daniel was entitled to his own student assembly to respond. In particular, plaintiffs contend that:

> [o]n April 26, 2004, school officials sanctioned the open forum in the school's auditorium for the purpose of eulogizing the student who had died. After the incident, that same forum was admittedly used by students to express their emotions and feelings about the racially charged comment attributed to Daniel. (Kuntz. Aff. ¶ 14.) School officials testified that many students would come up to the mike and "express their thoughts about the student that passed away . . . and why did this student say these things." (Kuntz. Aff. ¶ 14.) Daniel was not provided with the same opportunity despite the fact that the school had created a forum that very same week for speech it found acceptable.

(Plaintiffs' Memorandum of Law, at 13.) To the extent that plaintiffs contend that this assembly was sufficient to convert the auditorium into a public forum, such that the school administration could not deny Daniel an opportunity to hold an assembly there on a topic of his choosing, the Court finds such argument unpersuasive. It is undisputed that (1) the assembly was a school-sponsored assembly designed to aid students in coping

with loss and sadness from a student's death; and (2) the assembly was scheduled *prior* to the making of the comment at issue and was not intended to encompass the reactions to that comment. The school opened the auditorium for a narrow period of time to discuss the narrow topic of a student's death. Therefore, it was analogous to class time in that the school was holding the event for a particular pedagogical aim. The fact that the assembly was opened to students to make comments does not change the nature of the forum. Nor does the fact that students may have made comments about Daniel and the alleged statement during that assembly turn the auditorium into a public forum for use by any student. There is no indication that students wishing to speak in support of Daniel were prevented from doing so during the assembly on April 26th. Moreover, Daniel did not prepare his letter and make the request to give his statement to students until April 27th. Under these circumstances, there is no basis for requiring the school to hold another assembly specifically to create an opportunity for Daniel to respond to prior, spontaneous statements by other students. *See Hazelwood*, 484 U.S. at 267 ("School facilities may be deemed to be public forums only if school authorities have by policy or practice opened those facilities for indiscriminate use by the general public or by some segment of the public . . . . If the facilities have instead been reserved for other intended purposes, communicative or otherwise, then no public forum has been created . . . ."); *see also Corder v. Lewis Palmer Sch. Dist. No. 38*, 566 F.3d 1219, 1227 (10th Cir. 2009) ("school boards have the authority to determine 'what manner of speech in the classroom or in school assembly is inappropriate'") (quoting *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 683 (1986)). In short, the fact that students used a grieving session in the auditorium to voice objections to the offensive comment attributed to Daniel about the student's death did not convert the auditorium into a public forum such that Daniel had a right to speak at a separate school assembly to respond.

Second, the use of the school's public announcement system would also turn Daniel's private statement into school-sponsored speech. *See, e.g., Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 309-10 (2000) ("The delivery of [a religious] message – over the school's public address system, by a speaker representing the student body, under the supervision of school faculty, and pursuant to a school policy that explicitly and implicitly encourages public prayer – is not properly characterized as 'private' speech.").

Third, the distribution of a statement by the school also would constitute school-sponsored speech as it may be perceived as a school publication bearing the imprimatur of the school. Any communication which uses the resources or distribution system of the school for dissemination of speech may be reasonably seen as school-sponsored. *See, e.g., Busch v. Marple Newtown Sch. Dist.*, No. 07-2967, 2009 U.S. App. LEXIS 11696, at *23 (3d Cir. June 1, 2009) (courts have found that show and tell presentations could "'appear to bear the school's seal of approval'") (citation omitted).

Therefore, if plaintiffs were only alleging that Daniel was denied access to give the statement at a school assembly, over the public address system, or through a mass distribution of the statement by the school, the school's conduct would be analyzed under the *Hazelwood* standard for the regulation of school-sponsored speech. However, plaintiffs assert more than that. Plaintiffs assert that

Daniel was prohibited from returning to the school at all to distribute his written statement without assistance from the school and/or speak to other students about it during non-instructional hours.[5] Given plaintiffs' assertion that Daniel also was prohibited from returning to school to disseminate his statement in a manner not sponsored by the school, the Court must analyze the school's conduct under the more stringent *Tinker* standard, rather than the *Hazelwood* standard.[6]

---

[5] The Court notes that the focus of plaintiffs' complaint, as well as the testimony at the depositions and oral argument, was the school's refusal to give Daniel access to the school's public address system and/or a school assembly. As noted above, such speech would clearly be school-sponsored and would be analyzed under *Hazelwood*. However, the Court liberally construes the complaint to include a general allegation that Daniel was also denied the ability and option to return to the school and convey his speech without any assistance from the school.

[6] The Court notes that a school can place certain restrictions on handbilling at schools even if such speech is not school-sponsored. School "hallways constitute nonpublic forums." *M.A.L. v. Kinsland*, 543 F.3d 841, 846 (6th Cir. 2008). As such, schools have the ability to regulate the time, place, and manner of distributions in the hallways. "Prohibiting handbilling in the hallway between classes is . . . reasonable to avoid congestion, confusion, and tardiness, to say nothing of the inevitable clutter caused when the recipient indiscriminately discards the handout." *Muller ex rel. Muller v. Jefferson Lighthouse Sch.*, 98 F.3d 1530, 1543 (7th Cir. 1996) ("When, where, and how children can distribute literature in a school is for educators, not judges, to decide provided [such choices] are not arbitrary or whimsical. [Requiring] the student and principal to determine cooperatively an appropriate time and place for the distribution . . . . permits flexibility so that the unique needs of the school and the student can be accommodated. There is nothing a priori

### b. Analysis under *Tinker*

As a threshold matter, the Court notes that, with respect to the First Amendment claim, the period of time that is at issue is from April 26, 2004, which is the date of the events at the school regarding the alleged comments, and April 30, 2004, which is the date on which the school suspended Daniel for 5 days. Once the 5-day suspension took place on April 30, 2004, and once Daniel was suspended for the remainder of the school year after a Superintendent's Hearing on May 7, 2004, the First Amendment claim became moot because Daniel was no longer permitted to be at the school. Although there could be potential separate claims for such decisions by the school (which are discussed *infra*) under the Due Process or Equal Protection Clauses, the existence of any such claims is independent of

---

unreasonable about that."). Plaintiffs have not identified any other student or organization who was permitted to distribute literature in the hallway. Therefore, plaintiffs have produced no evidence that defendants have opened the hallway up to student distribution of leaflets. *See, e.g., M.A.L. v. Kinsland*, 543 F.3d 841, 847 (6th Cir. 2008) ("Jefferson school authorities have done nothing to indicate that the Jefferson Middle School hallways have been opened for indiscriminate use by the public, and the hallways therefore constitute a nonpublic forum. The school district accordingly is entitled to put time, place, and manner restrictions on hallway speech so long as the restrictions are viewpoint neutral and reasonable in light of the school's interest in the effectiveness of the forum's intended purpose."). However, as noted above, because plaintiffs assert that the prohibition by the defendants went beyond restrictions on when, where and how he did it, but rather extended to completely prohibiting him from communicating his statement *in any manner* at the school (including by not letting him into the school), *Tinker* is the applicable standard.

the First Amendment issue. Therefore, the critical question for the First Amendment claim is the following: whether, between April 26, 2004 and April 30, 2004, school officials reasonably concluded that the speech at issue – Daniel's request to provide a written or oral statement to the students regarding the rumored comment – would "materially and substantially disrupt the work and discipline of the school." *Tinker*, 393 U.S. at 513.

Defendants argue that the principal denied Daniel's request to return to school to address other students regarding the rumored comment because he feared that such an event would lead to even greater hostility toward Daniel and would create disruption in the school and an unsafe environment for Daniel and the student body. Plaintiffs contend that there was no basis for such a conclusion. As set forth below, the Court agrees with defendants and concludes that summary judgment is warranted on the First Amendment claim because, based upon the undisputed facts, no rational jury could find that the defendants, in prohibiting Daniel's return to the school and speech regarding the incident, did not reasonably conclude that such speech would materially and substantially disrupt the work and discipline of the school.

The undisputed facts demonstrate that both on the day of the rumored comment by Daniel, as well as the weeks that followed, there was overwhelming basis for concern about Daniel's safety if he were to return to school for any reason (including to engage in some type of speech to the students). In particular, plaintiffs did not controvert the following facts from the events of April 26, 2004 regarding threats to Daniel's safety at the school: (1) after the rumor spread through the school that Daniel was the originator of

the "one down, 40,000 to go" comment, Daniel was confronted by 4 or 5 Latino students in the cafeteria, who were yelling about a racist comment and threw something at him (Defs.' 56.1 ¶ 8; Daniel Dep. at 40); (2) Daniel was scared and thought he was going to get beat up (Defs.' 56.1 ¶ 9; Daniel Dep. at 44); (3) Daniel did not resist the guidance counselor's attempt to remove Daniel from the cafeteria and Daniel was "pretty scared" at that time (Defs.' 56.1 ¶ 11; Daniel Dep. at 46); (4) while Daniel was in the nurse's office, Daniel heard people outside the office yelling that they were going to "kill" him and Daniel could see a lot of Latino students looking through a window, which made plaintiff very uncomfortable and very afraid (Defs.' 56.1 ¶¶ 16-17; Daniel Dep. at 53-54); (5) Daniel ran out of the school with a police officer and an Assistant Principal on each side of him (Defs.' 56.1 ¶ 18; Daniel Dep. at 57-58); and (6) as he left the school, some Latino students were still watching him at a window, and some were yelling at him in Spanish as he passed by (Defs.' 56.1 ¶ 19; Daniel Dep. at 58-59). As Daniel testified at his deposition, even after he returned home, he remained scared because of threats he had heard at the school by other students to kill him or bomb his house:

Q. Were you still frightened at that time [i.e., when he arrived home]?

A. Very. More than before.

Q. What, specifically, was frightening you at that time?

A. People saying they were going to kill me, saying they were going to bomb my house.

Q. Those were things you heard while

you were in school?

A. Yeah.

(Daniel Dep. at 62-63).

However, the threats did not end when Daniel left the school that day. In particular, there is undisputed evidence that the threats to Daniel and concerns about his safety continued in the days and weeks after the incident, including the following: (1) between April 26, 2004 and May 7, 2004, Daniel received a couple of threatening phone calls to his house and cell phone (Defs.' 56.1 ¶ 31; Daniel Dep. at 95-96); (2) the police stayed in the vicinity of his house for about one week after April 26, 2004 because the principal was hearing threats in the school that people were going to light Daniel's house on fire (Defs.' 56.1 ¶ 32; Daniel Dep. at 105-06). Daniel testified that his mother expressed concerns to him that someone was going to come to the house and kill Daniel. (Daniel Dep. at 77). Daniel also testified that, although he wanted to return to school in one respect, he did not want to in another respect because he was "pretty scared." (Daniel Dep. at. 75-76). In fact, Daniel did not leave his home from April 26, 2004 until May 7, 2004, when he had a meeting with Latino students. (Daniel Dep. at 95).

Based upon this record, it is undisputed that there were threats to Daniel's personal safety not only on the date of the rumored incident, but in the days and weeks that followed. Given those facts, it was reasonable for the school to conclude that Daniel's presence at the school – even if to engage in some type of speech to proclaim his innocence – posed a threat to his personal safety and the safety of other students because of the real possibility that violence could erupt in the

school due to his presence and/or speech, and no rational jury could find otherwise. Plaintiffs suggest that such fears were ill-founded because, once Daniel gave his explanation and professed his innocence to the students, the threats and safety issues would have been eliminated. That argument ignores two key problems confronted by the school. First, Daniel's mere presence at the school, even to attempt to engage in speech, could have resulted in a violent incident involving Daniel and/or others, given the volatile circumstances. Second, the school officials had no way of predicting whether the response to Daniel's speech by other students would have been positive. In other words, the school faced the reasonable possibility that other students would not have believed his proclamation of innocence and that his speech would escalate an already volatile, emotional situation at the school and result in violence to Daniel and/or others at the school.[7]

To the extent that plaintiffs may suggest that the school, even if they did not allow Daniel to return to the school to engage in the speech during this period, should have distributed his written statements to all students. As a threshold matter, the Court

---

[7] Further, with respect to any assembly and/or use of the PA system, the Superintendent was concerned that, even if the statement as written was not likely to be disruptive, once a student had access to the PA system, his message might change. (Superintendent's Dep. at 45-47 ("My experience is that you don't give the students a live microphone with the student body as the audience . . . . During the time that I've been there, we have not given permission for a student to address the entire school over the intercom system.").) This concern highlights the volatile and unpredictable nature of the situation that confronted the school at that time under extraordinary circumstance.

notes that any distribution of his statement by the school under these circumstances would constitute school-sponsored speech because, among other things, the school's involvement in any way in the distribution of this statement might reasonably have been perceived to bear the imprimatur of the school. The school's refusal to sponsor such speech is not only justifiable under *Hazelwood*, but also satisfies the more stringent *Tinker* standard for the same reasons articulated above – namely, concerns about the disruption to the school that such speech could cause, including violence or other disruptions by angry and emotional students who may not believe Daniel's statement and are outraged by his false exculpatory statement, by the school's willingness to give him a forum to make it, and by his potential return to the school. In other words, while the distribution of his speech at the school in his absence would eliminate any potential harm to Daniel at the school, it would not eliminate the potential harm and disruption to the school that could reasonably result from the response of students to his speech even in his absence.

In this context, it is well settled that school officials do not have to wait for actual disruption from the speech before they act; instead, school officials have an affirmative duty to prevent the disruption to the school environment from occurring in the first place. *See, e.g., Doninger v. Niehoff*, 527 F.3d 41, 51 (2d Cir. 2008) ("[plaintiff's] argument is misguided insofar as it implies that *Tinker* requires a showing of actual disruption to justify a restraint on student speech"); *see also Lowery v. Euverard*, 497 F.3d 584, 596 (6th Cir. 2007) ("[s]chool officials have an affirmative duty to not only ameliorate the harmful effects of disruptions, but to prevent them from happening in the first place"); *LaVine v. Blaine Sch. Dist.*, 257 F.3d 981, 989

(9th Cir. 2001) ("*Tinker* does not require school officials to wait until disruption actually occurs before they may act."). To hold otherwise would be to preclude school officials from preventing harm to students, including violence, even where the substantial disruption is reasonably foreseeable. Nothing in the First Amendment, or the Supreme Court jurisprudence interpreting the First Amendment, requires such an absurd rule. As the Sixth Circuit has explained, if school officials had to wait for an actual disruption to satisfy the *Tinker* test,

> school officials would be between the proverbial rock and the hard place: either they allow disruption to occur, or they are guilty of a constitutional violation. Such a rule is not required by *Tinker* and would be disastrous public policy: requiring school officials to wait until disruption actually occurred before investigating would cripple the officials' ability to maintain order.

*Lowery*, 497 F.3d at 596; *see also Melton v. Young*, 465 F.2d 1332, 1335 (6th Cir. 1972) ("Surely those charged with providing a place and atmosphere for educating young Americans should not have to fashion their disciplinary rules only after good order has been at least once demolished.").

Not only are school officials free to act before the actual disruption occurs, they are not required to predict disruption with absolute certainty to satisfy the *Tinker* standard. Although plaintiffs seek to second-guess with hindsight the judgment of school administrators, that is not the role of the

courts. If the school's decision satisfies the constitutional standard in *Tinker*, then it is irrelevant that a litigant or court believes the situation could have been handled better. *See Wood v. Strickland*, 420 U.S. 308, 326 (1975) ("It is not the role of the federal courts to set aside decision of school administrators which the court may view as lacking a basis in wisdom or compassion."). As the Supreme Court has emphasized in *Morse*, "[s]chool principals have a difficult job, and a vitally important one." 551 U.S. at 409-10. Moreover, "[f]orecasting disruption is unmistakably difficult to do." *LaVine*, 257 F.3d at 989. Thus, rather than requiring certainty of disruption, *Tinker* allows school officials to act and prevent the speech where they "'might reasonably portend disruption' from the student expression at issue." *Doninger*, 527 F.3d at 51 (quoting *LaVaine*, 257 F.3d at 989); *see also Nuxoll ex rel. Nuxoll v. Indian Prairie Sch. Dist. #204*, 523 F.3d 668, 673 (7th Cir. 2008) ("Taking the case law as a whole we don't think a school is required to prove that unless the speech at issue is forbidden serious consequences will *in fact* ensue. That could rarely be proved . . . . It is enough for the school to present facts which might reasonably lead school officials to forecast substantial disruption.") (quotations and citations omitted); *LaVine*, 257 F.3d at 990 ("[B]ecause of the special circumstances of the school environment, the level of disturbance required to justify official intervention is lower inside a public school than it is outside the school."). Moreover, in assessing the reasonableness of the decision regarding potential disruption, courts must keep in mind that school officials also are entitled to rely upon their expertise and experience in making these often difficult judgments in extraordinary circumstances. As one court has noted,

The First Amendment does not deprive school administrators of the ability to rely upon their own considerable experience, expertise, and judgment in recognizing and diffusing the potential for disruption and violence in public schools. Indeed, they are duty-bound to do just that. That duty is particularly acute when threats of physical violence have already been made and actual violence could well erupt if the hostile situation is not promptly and emphatically controlled.

*Governor Wentworth Regional School Dist. v. Hendrickson*, 421 F. Supp. 2d 410, 423-24 (D. New Hamp. 2006).

The Court recognizes that the issue of reasonable foreseeability is often a fact-specific question for a jury to decide. However, where the undisputed facts demonstrate the existence of a reasonably foreseeable risk of substantial disruption, and no reasonable jury could conclude otherwise, then the school officials are entitled to summary judgment. *See, e.g., Wisniewski v. Bd. of Educ. of Weedsport Cent. Sch. Dist.*, 494 F.3d 34, 40 (2d Cir. 2007) (affirming summary judgment in favor of school officials because "[w]hether these aspects of reasonable foreseeability are considered issues of law or issues of fact as to which, on this record, no reasonable jury could disagree, foreseeability of both communication to school authorities, including the teacher, and the risk of substantial disruption is not only reasonable, but clear"). That is precisely the situation here. The undisputed facts – including the threats to Daniel on the day of

the incident and the days following the incident – demonstrate that school officials could reasonably conclude any attempt by Daniel to engage in speech at the school during this emotional and volatile time period, even if to explain his version of events with respect to the comment at issue – would "materially and substantially disrupt the work and discipline of the school." *Tinker*, 393 U.S. at 513. The school's concerns had absolutely nothing to do with the discomfort and unpleasantness which generally accompanies an unpopular viewpoint as described in *Tinker*; rather, given the escalating hostility towards Daniel at the school on April 26th and in the days that followed, as well as the high emotion over the loss of a classmate and the anger about the racially inflammatory comment that was attributed to Daniel, the school officials made the reasonable judgment that Daniel's attempted explanation could be rejected by the students and lead to a potentially disruptive and/or violent reaction that could place Daniel and/or other students and teachers in danger.[8] *See, e.g., Hendrickson*, 421 F. Supp. 2d at 423 ("School authorities were not required to put their heads in the sand and allow further escalation of that hostility, and concomitant

disruption to the school environment, simply because [plaintiff] cloaked his [symbolic speech ] in a laudable First Amendment justification."). Although plaintiffs disagree with that judgment, the undisputed facts do not provide a basis for finding a constitutional violation of Daniel's free speech right under the First Amendment.

Finally, to the extent that plaintiffs suggest that the school's actions completely foreclosed any ability he had on his own to proclaim his innocence with respect to the comment and defuse the situation, that assertion is simply not supported by the record. First, on May 7, 2004, the principal accompanied Daniel to a meeting with 12 student leaders from the Latino community at East Hampton High School at which Daniel explained that he was not the originator of the comment and distributed a copy of the statement he wanted to read over the loudspeaker. (Daniel Dep. at 90-91). Second, the school posted the statement in the faculty lounge for faculty members to see. (Farina Dep. at 56-57.) Third, at no time did the school ever limit Daniel's speech off school grounds. In other words, Daniel was not prevented from distributing his statement outside of school grounds or otherwise communicating his position to fellow students on his own via telephone, email, or any other channel available to him. Daniel could have invited students to a location off the school's premises to make his statement. In fact, he could even have stood outside the school gates communicating his message to students as they left. Counsel for defendants, at oral argument, noted that they never sought to foreclose any such speech outside of school by Daniel.

In sum, for the reasons discussed *supra*, the Court holds that the school administration's

---

[8] Although the speech at issue is different, these are the same types of safety concerns that have led several circuit courts to uphold under *Tinker* a school's decision to prohibit students from displaying the Confederate flag. *See D.B. ex rel. Brogdon v. Lafon*, 217 Fed. Appx. 518, 523 (6th Cir. 2007) (upholding ban on students displaying Confederate flags because "school officials could reasonably surmise that such displays posed a substantial risk of provoking problems in the incendiary atmosphere then existing"); *accord Scott v. School Bd. of Alachua County*, 324 F.3d 1246, 1249 (11th Cir. 2003); *West v. Derby Unified School Dist.*, 206 F.3d 1358, 1366 (10th Cir. 2000).

decision to deny Daniel access to the school's non-public fora to engage in speech regarding the rumored statement by him – including at a school assembly, via the public announcement system, or any other distribution system at the school, or by Daniel on school grounds without assistance from the school – did not violate his First Amendment rights to free speech as a matter of law given the undisputed facts in this case.

### c. Qualified Immunity

Defendants argue that, even assuming *arguendo* that a First Amendment violation occurred, the individual defendants should be entitled to qualified immunity under the facts of this case. The Court agrees. It is well settled that "[t]he initial question with respect to qualified immunity is whether, viewing the facts alleged in the light most favorable to the plaintiff, there was a constitutional violation." *Fierro v. City of N.Y.*, No. 08-3952-cv, 2009 WL 2223067, at *1 (2d Cir. July 27, 2009) (summary order) (citing *Clubside, Inc. v. Valentin*, 468 F.3d 144, 152 (2d Cir. 2006)). "If the answer to that question is yes, then the Court must determine if that right was clearly established at the time the challenged decision was made, and whether the defendants' actions were objectively unreasonable." *Fierro*, 2009 WL 2223067, at *1 (citing *Harhay v. Town of Ellington Bd of Educ.*, 323 F.3d 206, 211 (2d Cir. 2003)). As the Supreme Court has explained, "[q]ualified immunity shields an official from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). Although there is no question that the *Tinker* rule is clearly established, the application of that test to the particular circumstances here leaves

room for school officials, at a minimum, to reasonably disagree as to whether the return of Daniel to the school (and his proposed speech at the school) in the days following the incident would lead to substantial disruption. As one court noted,

> Even if [the defendant] did violate [the plaintiff's] First Amendment right to free speech, summary judgment would still be appropriate because she is entitled to a qualified immunity defense as a matter of law. *Tinker* established a right for students to exercise *non-disruptive* expression anywhere on school grounds. At some point, however, expressive speech crosses the line into "disruptive" and thus gives way to school officials' ability to maintain order and discipline in an educational environment. The clearly established right is that students may not be punished or stopped from engaging in *non-disruptive* speech. Where that expression may be fairly characterized as "disruptive," however, it crosses into a constitutional gray area in which school officials are reasonable in their belief that they are acting lawfully to put a stop to the disruptive student behavior.

*Acevedo v. Sklarz*, 553 F. Supp. 2d 164, 170 (D. Conn. 2008); *see also Hosty v. Carter*, 412 F.3d 731, 739 (7th Cir. 2005) ("Public officials need not predict, at their financial

peirl, how constitutional uncertainties will be resolved."); *Litman v. George Mason Univ.*, 5 F. Supp. 2d 366 (E.D. Va. 1998) ("Part of the qualified immunity test is whether a reasonable person in the defendant's position would have known that his actions violated the plaintiff's First Amendment rights. Defendants in this case could reasonably have viewed [plaintiff's] actions of sending numerous e-mails and other writings to professors regarding her claims of sexual harassment as highly disruptive of the professors' work, and thus are entitled to qualified immunity . . . .").

Accordingly, even assuming *arguendo* that there was a First Amendment violation as to Daniel's freedom of speech (which there was not), the individual school officials are entitled to summary judgment under the doctrine of qualified immunity.[9]

### 2. Freedom of Association Claim

Plaintiffs also contend that the school's decision to prohibit Daniel from engaging in speech at the school unlawfully infringed on his right to freedom of association protected by the First and Fourteenth Amendments. As set forth below, because this claim is entirely duplicative of the free speech claim (which the Court has concluded cannot survive summary judgment), summary judgment in

---

[9] Similarly, the school district and school board are entitled to summary judgment because of the absence of any evidence of a policy or custom that form the basis of liability against these municipal entities under *Monell v. Department of Social Services*, 463 U.S. 658 (1978). In any event, as noted *infra*, because there is no basis for an underlying constitutional violation by the individual school officials, no claims can exist against the school district or the school board under *Monell*.

defendants' favor on the freedom of association claim is also warranted.

As the Second Circuit has explained, "[t]he Supreme Court has recognized a right of association with two distinct components – an individual's right to associate with others in intimate relationships and a right to associate with others for purposes of engaging in activities traditionally protected by the First Amendment, such as speech and other expressive conduct." *Adler v. Pataki*, 185 F.3d 35, 42 (2d Cir. 1999) (citing *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617-18 (1984)). In the instant case, it is clear that plaintiff is attempting to assert a violation of the latter right of association – often referred to as "expressive association." In other words, plaintiff argues that the school officials' refusal to allow the speech interfered with Daniel's right of association by prohibiting him from communicating his message to his fellow students in violation of his free speech rights. (*See* Plaintiff's Opposition Memorandum, at 14 ("The First Amendment protects not only a citizen's right to speak freely but also his or her right to associate freely with other speakers of similar or opposing opinions. District officials intended to interfere with Daniel's comments on a subject they wanted to erase. Attempt to silence Daniel on a subject which made the school officials uncomfortable.") (citation omitted)).[10] Under such circumstances, the free association claim is entirely duplicative of the free speech claim. Thus, because the

---

[10] The conclusory and duplicative nature of this claim is further illustrated by the fact that, in the opposition to the motion, plaintiffs brief this issue in the same section as the free speech claim and, as noted above, only briefly mention the right of association in conjunction with the free speech claim.

Court has already concluded as a matter of law that the defendants did not violate Daniel's free speech rights by refusing to allow him to communicate his message to the students regarding the rumored comment, the officials' conduct in that regard did not infringe upon any right by Daniel to associate with others for purposes of engaging in activities traditionally protected by the First Amendment. Accordingly, summary judgment on the freedom of association claim is warranted for the same reason as the free speech claim.[11] *See, e.g., Illiano v. Mineola Union Free Sch. Dist.*, 585 F. Supp. 2d 341, 355 (E.D.N.Y. 2008) ("Here, the Plaintiff's freedom of association claim is duplicative of her inviable freedom of speech claim. Accordingly, defendants' motions to dismiss plaintiff's freedom of association claim under § 1983 are granted."); *Birmingham v. Ogden*, 70 F. Supp. 2d 353, 369 (S.D.N.Y. 1999) (dismissing right of association claim as duplicative of free speech claim); *see also Henley v. Tullahoma City Sch. Sys.*, 84 Fed. Appx. 534, 2003 WL 22978590, at *8 (6th Cir. Dec. 5, 2003) ("dismissal of Plaintiffs' freedom of association claims was warranted because they were merely duplicative of their meritless retaliation claims").

Accordingly, the Court grants defendants' motion for summary judgment on plaintiffs' freedom of association claim.

### 3. Substantive Due Process Claim

Plaintiffs also assert a substantive due process claim based upon the school officials' decision to suspend Daniel, first for 5 days and then for the remainder of the school year. As set forth below, plaintiffs have failed to present evidence to create a genuine issue of material fact on the substantive due process claim; rather, the undisputed facts demonstrate that this claim fails as a matter of law.

The Due Process Clause of the Fourteenth Amendment protects persons against deprivations of "life, liberty, or property." U.S. Const. amend. XIV, § 1. The Fourteenth Amendment "does not provide a comprehensive scheme for determining the

---

[11] The Court notes that, even assuming plaintiffs were trying to assert a free association claim based upon an "intimate association" theory, such a claim also would not survive summary judgment. As a threshold matter, although the right of intimate association has been found to extend to "child rearing and education," *Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 545 (1987), the precise contours of that right in the school context, as it relates to the protection of relationships between parents and students or among students, are not well-defined. *See Angstadt v. Midd-West School Dist.*, 377 F.3d 338, 343-45 (3d Cir. 2004) (discussing right of association in school context); *Pi Lamda Phi Fraternity, Inc.*, 58 F. Supp.2d 619, 623-26 (W.D. Pa. 1999) (same); *see also Henley v. Tullahoma City Sch. Sys.*, 84 Fed. Appx. 534, 2003 WL 22978590, at *8 (6th Cir. Dec. 5, 2003) (same). In any event, assuming *arguendo* that this type of claim could be asserted based upon Daniel's inability to associate with classmates, such claim could not survive summary judgment where the undisputed facts (discussed *supra* in connection with the free speech claim) demonstrate that the refusal to allow Daniel to return to the school to communicate his message was based upon a reasonable belief by school administrators that such speech could disrupt the school environment and pose a threat to school safety. *See generally Jackson v. Franklin County Sch. Bd.*, 765 F.2d 535, 538 (5th Cir. 1985) ("[T]he public schools unquestionably retain their authority to remove any student . . . who disrupts the educational process or poses a threat to a safe school environment.").

propriety of official conduct or render all official misconduct actionable." *Pena v. DePrisco*, 432 F.3d 98, 112 (2d Cir. 2005). Instead, the scope of substantive due process is very limited. *See Washington v. Glucksberg*, 521 U.S. 702 (1997). The Supreme Court has said that it is "reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. Harker Heights*, 503 U.S. 115, 125 (1992). Substantive due process is a means of "protection of the individual against arbitrary action of government." *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974); *Glucksberg*. "In order to establish a violation of a right to substantive due process, a plaintiff must demonstrate not only government action but also that the government action was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Id.* (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)). To satisfy this standard, a plaintiff must show that the government decision it challenges "was arbitrary or irrational or motivated by bad faith." *Rosa R. v. Connelly*, 889 F.2d 435, 439 (2d Cir. 1989). As set forth below, the undisputed facts demonstrate that no reasonable jury could find that standard to be satisfied and plaintiffs have failed to raise a genuine issue of material fact on this claim that survives summary judgment.

A school administration's decision to suspend a student will provide a basis for a substantive due process claim only in the very "rare case" when there is "no rational relationship between the punishment and the offense." *Rosa R. v. Connelly*, 889 F.2d 435, 439 (2d Cir. 1989); *see also Bd. of Educ. v. McCluskey*, 458 U.S. 966, 970 (1982) (finding no due process violation where a school

board's interpretation of its rules is reasonable); *Wood v. Strickland*, 420 U.S. 308, 326 (1975) ("It is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion. Public high school students do have substantive and procedural rights while at school. But § 1983 does not extend the right to relitigate in federal court evidentiary questions arising in school disciplinary proceedings or the proper construction of school regulations. The system of public education that has evolved in this Nation relies necessarily upon the discretion and judgment of school administrators and school board members, and § 1983 was not intended to be a vehicle for federal-court corrections of errors in the exercise of that discretion which do not rise to the level of violations of specific constitutional guarantees.") (internal citations omitted); *Tun v. Whitticker*, 398 F.3d 899, 904 (7th Cir. 2005) (finding that a student's expulsion for "horsing around in the boys' locker room" was a "regrettable" "overreaction by the defendants, including an overly broad reading of the district's behavior code," but did not constitute a violation of the student's substantive due process rights); *Butler v. Rio Rancho Pub. Schs. Bd. of Educ.*, 341 F.3d 1197, 1200-01 (10th Cir. 2003) ("Absent certain factors not present here, we will uphold a school's decision to suspend a student in the face of a substantive due process challenge if the decision is not arbitrary, lacking a rational basis, or shocking to the conscience of federal judges."); *Seal v. Morgan*, 229 F.3d 567, 575 (6th Cir. 2000).

Plaintiffs have presented no evidence that the defendants' actions were arbitrary, irrational or motivated by bad faith. As discussed in detail in connection with the free speech claim, it is undisputed that there were

threats to Daniel's safety on the day of the incident and in the days that followed and that there was an emotional and volatile situation at the school because of the tragic death of the Latino student and the offensive comment attributed to Daniel. Thus, the record is clear that the school first kept Daniel out of school out of concern for his safety and "[t]here is no doubt [that schools] ha[ve] a legitimate interest in providing a safe environment for students and staff." *Butler*, 341 F.3d at 1201. Therefore, sending Daniel home for his safety and keeping him out of the school in the days following the incident was rationally related to that legitimate interest and no reasonable jury could find that such a decision, given the undisputed facts, constituted a violation of his substantive due process rights.

Similarly, with respect to the suspension, plaintiffs do not argue that, if Daniel had made the offensive comment, that the punishment would have been unwarranted. Instead, they contend that there was an insufficient factual basis for the school to conclude that he had made the statement and cite the Commissioner's decision overturning the suspension to support that assertion. However, it is undisputed that a fellow student testified at the Superintendent's hearing that he heard Daniel make the offensive comment in question, without qualification. Thus, even though the Commissioner eventually overturned the suspension because the Superintendent failed to make individual credibility findings in his decision, the Commissioner's decision does not provide a sufficient basis for a reasonable jury to conclude that the Superintendent's determination and the decision to suspend Daniel for the remainder of the year was arbitrary, lacking a rational basis, or lacking a relationship between the punishment and the offense.

In sum, plaintiffs have presented no evidence from which a reasonable jury could find that the school administration's actions with respect to Daniel in the aftermath of the April 26th events – including his removal from the school and subsequent suspension for the school year – were arbitrary, irrational or motivated by bad faith. Accordingly, the Court grants defendants' motion for summary judgment on plaintiffs' substantive due process claims.

4. Procedural Due Process Claim

In order to assert a violation of procedural due process rights, a plaintiff must "first identify a property right, second show that the [government] has deprived him of that right, and third show that the deprivation was effected without due process." *Local 342, Long Island Pub. Serv. Employees, UMD, ILA, AFL-CIO v. Town Bd. of Huntington*, 31 F.3d 1191, 1194 (2d Cir. 1994) (citation omitted) (emphasis in original). Daniel had a constitutionally protected right to a public education. Property interests derive from state law. *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972). New York's Constitution and education laws provide a right to elementary and secondary education for children up to the age of eighteen. N.Y. Const. Art. 8 § 1; N.Y. Educ. L. § 3202 (1). It is undisputed that Daniel was suspended from school for a portion of the school year at issue. This constitutes a deprivation even if it were only for a relatively short period of time. *See Goss v. Lopez*, 419 U.S. 565, 576 (1975) ("Appellees were excluded from school only temporarily, it is true, but the length and consequent severity of a deprivation, while another factor to weigh in determining the appropriate form of hearing, is not decisive of the basic right to a hearing of some kind. The Court's view has been that as long as a

property deprivation is not de minimis, its gravity is irrelevant to the question whether account must be taken of the Due Process Clause.") (internal quotations and citations omitted). Therefore, the question is whether Daniel was deprived of education without due process. *See Goss*, 419 U.S. at 574 (1975) ("The authority possessed by the State to prescribe and enforce standards of conduct in its schools although concededly very broad, must be exercised consistently with constitutional safeguards. Among other things, the State is constrained to recognize a student's legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause and which may not be taken away for misconduct without adherence to the minimum procedures required by that Clause.")

"Once it is determined that due process applies, the question remains what process is due." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). The Supreme Court has stated that "[a]t the very minimum, . . . students facing suspension and the consequent interference with a protected property interest must be given some kind of notice and afforded some kind of hearing." *Goss*, 419 U.S. at 579. Courts must weigh the various interests at issue in determining what level of process is required. *Id.* As the Supreme Court has stated:

> The student's interest is to avoid unfair or mistaken exclusion from the educational process, with all of its unfortunate consequences. The Due Process Clause will not shield him from suspensions properly imposed, but it disserves both his interest and the interest of the State if his suspension is in fact unwarranted. The concern would be

mostly academic if the disciplinary process were a totally accurate, unerring process, never mistaken and never unfair. Unfortunately, that is not the case, and no one suggests that it is. Disciplinarians, although proceeding in utmost good faith, frequently act on the reports and advice of others; and the controlling facts and the nature of the conduct under challenge are often disputed. The risk of error is not at all trivial, and it should be guarded against if that may be done without prohibitive cost or interference with the educational process.

The difficulty is that our schools are vast and complex. Some modicum of discipline and order is essential if the educational function is to be performed. Events calling for discipline are frequent occurrences and sometimes require immediate, effective action. Suspension is considered not only to be a necessary tool to maintain order but a valuable educational device. The prospect of imposing elaborate hearing requirements in every suspension case is viewed with great concern, and many school authorities may well prefer the untrammeled power to act unilaterally, unhampered by rules about notice and hearing. But it would be a strange disciplinary system in an educational institution if no communication was sought by the disciplinarian with the student in an effort to inform him of his dereliction and to let him tell his side of the story in order to make sure that an injustice is not done.

"[Fairness] can rarely be obtained by secret, one-sided determination of facts decisive of rights . . . . Secrecy is not congenial to truth-seeking and self-righteousness gives too slender an assurance of rightness. No better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it." *Anti-Fascist Committee v. McGrath*, supra, at 170, 171-172 (Frankfurter, J., concurring).

*Goss*, 419 U.S. at 579-80.

In an effort to balance these interests, the Supreme Court in *Goss v. Lopez* set forth minimal due process requirements as it relates to suspensions of ten days or less. Specifically, the Court held that "[s]tudents facing temporary suspension have interests qualifying for protection of the Due Process Clause, and due process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Goss*, 419 U.S. at 581.[12] But "[a] formal hearing is unnecessary" for suspensions of ten days or less. *Rosenfeld v. Ketter*, 820 F.2d 38, 40 (2d Cir. 1987).

Where a longer suspension is at issue, greater process may be required. *See, e.g., Barnett v. Tipton County Bd. of Educ.*, 601 F. Supp. 2d 980, 985 (W.D. Tenn. 2009) ("A student's right to procedural due process requires formal procedures for student disciplinary hearings involving expulsion or suspensions of more than ten days. School officials must tailor disciplinary procedures to avoid 'unfair or mistaken findings of misconduct and arbitrary exclusions from school.' School board disciplinary hearings satisfy due process when the student is given the opportunity to refute and explain the allegations against him.") (quoting *Goss*, 419 U.S. at 581).

In the instant case, there are no disputed facts regarding the process afforded to Daniel. Thus, the question is whether the process was sufficient to satisfy the constitutional requirements of due process. As set forth below, the Court concludes, based upon the undisputed facts, that sufficient procedure was afforded to Daniel, both in connection with the initial 5-day suspension and the subsequent suspension for the remainder of the school year, to satisfy due process.

---

[12] New York state law provides greater protection for students facing suspension of over five days. Specifically, state law provides that:

No pupil may be suspended for a period in excess of five school days unless such pupil and the person in parental relation to such pupil shall have had an opportunity for a fair hearing, upon reasonable notice, at which such pupil shall have the right of representation by counsel, with the right to question witnesses against such pupil and to present witnesses and other evidence on his behalf. Where a pupil has been suspended in accordance with this subdivision by a superintendent of schools, district superintendent of schools, or community superintendent, the superintendent shall personally hear and determine the proceeding or may, in his discretion, designate a hearing officer to conduct the hearing.

N.Y. C.L.S. Educ. § 3214.

As a threshold matter, although plaintiffs suggest that Daniel was suspended from April 27-29, 2004, there is no evidentiary basis to support that conclusion. Plaintiffs admit that there was a hostile environment toward Daniel on April 26, 2004, that "[p]eople at school made threats that they would kill plaintiff and bomb his house, making him even more frightened" (Defs' 56.1 ¶ 20), and that "Dr. Farina advised Mrs. DeFabio that Daniel was being sent home from school because there were 150 students who wanted to knock down his door and beat up Daniel" and that "it wasn't safe for Danny to come back to school and Danny should stay home a few days until the situation calmed." (Defs' 56.1 ¶¶ 21-22.) Although plaintiffs now suggest in a conclusory fashion that Daniel was being disciplined from April 27-29, 2004, they point to no evidence from which a reasonable juror could find that Dr. Farina was motivated by something other than concern for Daniel's safety or that Dr. Farina had suspended Daniel prior to April 30, 2004.[13] In any event, even assuming *arguendo* that Daniel was being disciplined as of April 27, 2004, his initial suspension prior to the hearing was still for less than ten school days (from April 27, 2004 until May 8, 2004) and, therefore, need only satisfy the standard established in *Goss*.

With respect to the initial suspension for five days, it is undisputed that plaintiffs were advised in writing of that suspension by the principal on April 30, 2004 and that the letter provided the basis for that suspension. In particular, the letter provided:

> Pursuant to Education law 3214, your son, Daniel, is being suspended from East Hampton High School for five days. This suspension will begin on Monday, May 3rd and go through Friday May 8, 2004. He may return to school on Monday, May 11th. During this period of suspension, Daniel is not to be on school grounds or attend any school functions.
>
> This action is taken as the result of our investigation into circumstances surrounding the incident on Monday, April 26th. It has been found that Daniel was in violation of East Hampton High School's Code of Conduct. Specifically, he is in violation of Class C behavior for making the statement "one [****] down, forty thousand to go." As per our phone conversation on Monday April 26th and meeting on Thursday, April 29th, it was in the interest of Daniel's safety that he remain home pending the results of the investigation.

(Ex. M.) The letter also advised Ms. DeFabio that she had a right to an informal hearing and that a Superintendent's hearing might be convened. (*Id.*) It is also undisputed that, prior to this decision, Daniel had been given an opportunity to tell his side of the story before he was sent home on April 26, 2004,

[13] The Court also notes that the Commissioner also concluded that Daniel was not suspended when he was sent home on April 26, 2004 but rather was suspended on April 30, 2004. (*See* Commissioner's Decision dated August 7, 2006, at 3 ("The record before me does not indicate that D.D. was suspended at that time [*i.e.*, April 26, 2004].").)

and he was aware of the conduct at issue. Specifically, in the nurse's office on the day of the incident, Daniel was asked about the comment, denied being the originator, and provided his version of the events to both a guidance counselor and an Assistant Principal. (Defs.' 56.1 ¶¶ 13-15.) To the extent that plaintiffs suggest there need be some delay after suspension notice is given, the Supreme Court has explicitly rejected such a contention and noted that the student's explanation of the events often occurs within minutes of the alleged misconduct.[14] *See Goss*, 419 U.S. at 582 ("[t]here need be no delay between the time 'notice' is given and the time of the hearing. In the great majority of cases the disciplinarian may informally discuss the alleged misconduct with the student minutes after it has occurred."); *see also Rosenfeld*, 820 F.2d at 40 (holding that "discussions [after the incident] afforded [plaintiff] the opportunity required by *Goss* to characterize his conduct"). As the Supreme Court explained in *Goss*:

> Students whose presence poses a continuing danger to persons or property or an ongoing threat of disrupting the academic process may be immediately removed from school. In such cases, the necessary notice and rudimentary hearing should follow as soon as practicable, as the District Court indicated.

*Goss*, 419 U.S. at 582-83.

In short, because it is undisputed that Daniel was given written notice of the charges against him, an explanation of the evidence against him in the written charge, and an opportunity to deny the allegation and explain his side, *Goss* is satisfied and any procedural due process claim arising from the initial 5-day suspension must fail as a matter of law.[15]

With respect to the long-term suspension for the remainder of the school year, the undisputed facts again demonstrate that due process requirements were satisfied. First, plaintiffs received a letter a few days after the initial 5-day suspension notifying them that a Superintendent's hearing was to be held on Friday, May 7, 2004 – the fifth day of Daniel's suspension. (Defs' 56.1 ¶ 33; DeFabio Dep. at 54.) This time frame was in compliance with *Goss* and state law. *See* 2000 Op. Comm. Ed. No. 14,419 ("At end of 5th day of suspension, student must be readmitted to school unless hearing sustaining longer period of suspension was held within initial 5-day suspension period, or unless adjournment was requested by student or parent.") Moreover, it is undisputed that, on May 7, 2004, a full hearing was held before

---

[14] Daniel also provided his version of the events in the letter he prepared proclaiming his innocence on April 27, 2004, which he provided to the school, discussed *supra*.

[15] The Court notes that, although not required by *Goss*, additional process was afforded to Daniel prior to the suspension in that , on April 28, 2004, Ms. DeFabio and Mr. Rusinksy met with Principal Farina and others to discuss the situation. The Court notes that, even under New York law, no additional process is required prior to a 5-day suspension. *See, e.g., Turner v Kowalski*, 364 N.Y.S.2d 91 (N.Y. App. Div. 1975) ("Since no hearing is required prior to suspension of student for period not exceeding five days, school officials are not required to advise parents of any right to an informal conference prior to suspension of student for five days or less."), *modified on other grounds by* 374 N.Y.S.2d 133 (N.Y. App. Div. 1975).

the Superintendent and, at the hearing, plaintiffs had counsel who presented their version of the facts, including Daniel's testimony, and questioned the complaining witnesses. The hearing was held on a Friday and Daniel was told to stay home from school until a decision was made by the Superintendent. (DeFabio Dep. at 71.) A decision was made the next Monday. Specifically, the Superintendent found that Daniel was guilty of the offense and suspended him for the remainder of the school year, during which time he received home tutoring. (*Id.* at 72) Therefore, Daniel was given ample notice of the pending charge against him and a full opportunity to present his case at a formal hearing prior to the decision to suspend him for the remainder of the school year. Daniel was also provided with procedures to challenge that decision. In particular, after being suspended for the remainder of the school year, plaintiffs were entitled to appeal that decision. Plaintiffs, in fact, utilized that procedure. First, plaintiffs appealed the Superintendent's decision to the Board of Education of the East Hampton Union Free School District and "[b]y letter dated May 27, 2004, the superintendent notified petitioner that on May 18, 2004, respondent had reviewed the record of the superintendent's hearing and had upheld his determination and penalty." (Plaintiffs' Ex. C, at 2.) Plaintiffs then appealed to the New York State Commissioner of Education, who issued a decision on August 7, 2006, in plaintiffs' favor. Although plaintiffs also could have resorted to an Article 78 proceeding, such recourse was unnecessary because they were able to have the Commissioner overturn the suspension and have Daniel's record expunged, with all references to the situation removed from his permanent record at East Hampton. In short, because Daniel was provided with a full

hearing before his long-term suspension and the ability to challenge that suspension on appeal, the Court concludes that no procedural due process claim can exist as a matter of law for the long-term suspension.

This Court's conclusion on this issue is consistent with the dismissal of procedural due process claims by other courts under analogous circumstances. *See, e.g., Bogle-Assegai v. Bloomfield Bd. of Educ.*, 467 F. Supp. 2d 236, 243 (D. Conn. 2006) (granting summary judgment on due process claim based on a 180-day expulsion because "[p]laintiffs were provided notice of the expulsion hearing, given the opportunity to be represented by counsel (which they were), and given a full-blown hearing including the presentation of opening arguments, summations, and evidence, the introduction of which was governed by the federal rules of evidence" and the opportunity to cross-examine witnesses and present their own evidence), *aff'd*, 312 Fed. Appx. 435 (2d Cir. 2009) (summary order); *Rosa R.*, 889 F.2d at 438-39 (affirming grant of summary judgment on due process claim based on 180-day expulsion where student and his mother received notice, were given "ample opportunity to present their views" at a hearing, and had "recourse to appeal the Board's decision to the state board of education before the allegedly unconstitutional deprivation took effect"); *Cohn v. New Paltz Cent. Sch. Dist.*, 363 F. Supp. 2d 421, 433 (N.D.N.Y. 2005) (dismissing procedural due process claim on 180-day expulsion where plaintiff received notice of charges, disciplinary hearing was held, and appellate review of decision was available), *aff'd*, 2006 WL 3147357 (2d Cir. Oct. 31, 2006) (summary order).

Although plaintiffs assert several

arguments to attempt to avoid summary judgment on these claims, the Court finds those arguments unpersuasive. First, plaintiffs contend that this process was not valid because the school officials allegedly had made up their mind before providing such process. However, plaintiffs provide no evidence to support this conclusory assertion of bias. Thus, the Court concludes that plaintiffs' subjective belief that the decision-makers were not sufficiently open-minded about their position is insufficient to create an issue of fact on a procedural due process claim. *See, e.g., Hill v. Board of Trustees of Michigan State Univ.*, 182 F. Supp.2d 621 (W.D. Mich. 2001) ("[Plaintiff] has failed to raise a genuine issue as to the Student Faculty Judiciary's impartiality. He has not proffered any evidence of actual bias. Therefore, in this Court's judgment, [plaintiff] has failed to raise any genuine issue of material fact regarding his suspension after April 21, 1999."); *Reimer v. Burlington Area School Dist.*, 149 F. Supp. 2d 665, (E.D Wisc. 2001) ("There is a 'strong presumption' that administrative decisionmakers are impartial. [Plaintiff] has not overcome this presumption. In fact, she has presented no evidence at all that the school board members who voted to expel her son were biased against M.R. in any way. Absent such evidence, [plaintiff] may not proceed to trial on this point."); *see also McDonald ex rel. McDonald v. Sweetman*, No. 02-CV-1040 (MRK), 2004 WL 717166, at *4 (D. Conn. Mar. 24, 2004) ("While [plaintiff] may rightly feel that she was tried, convicted, and sentenced by school officials who had already made up their minds, the fact remains that before she was suspended, [plaintiff] was given oral notice of the charges against her, an opportunity to prevent her version of the facts, and an explanation, however feeble, of the evidence against her. That is all the process that is required under the Constitution.")

Plaintiffs' additional argument, that the failure by defendants to fully comply with New York Education Law Section 3214 can provide a basis for a due process claim, is similarly flawed. Plaintiffs correctly note that the Commissioner, in overturning the suspensions, found that the school officials failed to fully comply with state law. Specifically, although the Commissioner found that the initial absence from school was not a suspension, the Commissioner concluded: (1) that the subsequent five-day suspension was anulled because the April 30 letter did not inform plaintiffs that they could request an opportunity to question complaining witnesses (a requirement under state law, but not under *Goss*); and (2) that, with respect to the long-term suspension, "the record does not contain sufficient and competent evidence that [Daniel] generated the offensive comment and thus engaged in the objectionable conduct as charged" to support that suspension. (Plaintiffs' Ex. C.) Contrary to plaintiffs' contention, however, the fact that the New York State Commissioner of Education reversed the school's decision under state law does not indicate that there was a deprivation of due process under federal constitutional law. In other words, a failure to comply with N.Y. C.L.S. Educ. § 3214 does not necessarily constitute a violation of due process. Here, because the constitutional due process requirements were met, the failure to comply with certain provisions under state education law (that are not required by the United States Constitution) cannot give rise to a federal due process claim under Section 1983. *See, e.g., Mac Ineirghe v. Bd. of Educ. of East Islip Union Free Sch. Dist.*, 05-cv-4324 (JFB) (AKT), 2007 WL 2445152, at (E.D.N.Y. 2007) ("Based on the undisputed facts, the

Court finds that plaintiffs' due process rights were not violated as a matter of law. Although plaintiffs were not afforded the process described under N.Y. Educ. Law § 3214, plaintiffs were afforded the process due under the Constitution."); *see also Cohn*, 363 F. Supp. 2d at 432 (noting, in connection with New York Educational law, that "a violation of state law is not a recognizable claim under 42 U.S.C. § 1983").

Finally, to the extent plaintiffs argue that the post-deprivation procedures (although successful) violated due process because they took too long to get the suspension overturned, the Court disagrees. As one court has noted, "[i]t is well established in the context of disciplinary proceedings that post-discipline due process provides sufficient due process to satisfy the requirements of the Fourteenth Amendment." *Cohn*, 363 F. Supp. 2d at 433; *see also Giglio v. Dunn*, 732 F.3d 1133, 1135 (2d Cir. 1998) (post-deprivation Article 78 proceeding satisfies due process); *accord Gudema v. Nassau County*, 163 F.3d 717, 724 (2d Cir. 1998). Of course, a factor in assessing the adequacy of the post-deprivation procedures is how soon the procedures occur following the deprivation. *See, e.g., Butler v. Oak Creek-Franklin School Dist.*, 116 F. Supp. 2d 1038, 1052 (E.D. Wisc. 2000) ("A third factor to consider in determining the adequacy of a post-deprivation hearing is how soon it occurs after the deprivation."). As a threshold matter, plaintiffs received immediate post-deprivation process following the hearing and the Superintendent's decision to suspend Daniel for the remainder of the school year on May 10, 2004. In particular, plaintiffs appealed that decision to the East Hampton Board of Education and, by letter dated May 27, 2004, plaintiffs' counsel was advised that the Board had reviewed the record of the hearing and had upheld the Superintendent's determination and penalty.[16] (*See* Plaintiffs' Ex. P.) In short, that appeal process took only 17 days and, thus, the defendants provided plaintiffs with a timely post-deprivation review procedure. Although plaintiffs complain about the two-year delay in the subsequent decision by the New York State Commissioner of Education, there are several problems with that argument. First, plaintiffs acknowledge that they did not appeal the Board's May 27, 2004 decision to the Commissioner until June 28, 2004 (*see* Compl. ¶ 88), in a time frame when the school year and suspension had come to an end, and Daniel was free to return to the school in the fall of 2005. Second, although the desire to have the suspension annulled and expunged from the record was still at issue, there is nothing in the record to suggest that plaintiffs sought expedited review with the State Commissioner or suffered any effects from the delay. Finally, there is nothing in the record to suggest that the defendants had any control as to the timing of the New York State Commissioner's decision and, thus, cannot be held accountable for any such delay. In sum, there is no evidence in the record to support plaintiffs' assertion that the post-deprivation procedures provided by the defendants were untimely; rather, the undisputed facts show that the East Hampton Board of Education's review and decision occurred in a prompt manner.

In sum, the Court holds that the undisputed procedures afforded plaintiffs in connection with the initial and long-term suspension satisfied Daniel's due process rights under the U.S. Constitution and, accordingly, grants defendants' motion for summary judgment on the procedural due process claims.

---

[16] The Complaint alleges that the Board had heard the appeal on May 18, 2004. *See* Compl. ¶ 84.

### 5. Equal Protection

The Equal Protection Clause of the Fourteenth Amendment is "essentially a direction that all persons similarly situated be treated alike." *Latrieste Rest. v. Vill. of Port Chester*, 188 F.3d 65, 69 (2d Cir. 1999) (quoting *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985)). An individual not alleging invidious discrimination on the basis of membership in some group, may nevertheless prevail on an equal protection claim under the "class of one" theory recognized by the Supreme Court in *Willowbrook v. Olech*, 528 U.S. 562 (2000). Under a "class of one" equal protection claim, a plaintiff must show that (1) "[he] has been intentionally treated differently from others similarly situated and" (2) "there is no rational basis for the difference in treatment." *Willowbrook*, 528 U.S. at 564; *see also Giordano v. City of N.Y.*, 274 F.3d 740, 743 (2d Cir. 2001).

#### a. The *Engquist* Decision

As a threshold matter, this Court concludes that the Supreme Court's decision in *Engquist v. Oregon Department of Agriculture,* 128 S. Ct. 2146 (2008) would foreclose a "class of one" claim by plaintiffs in connection with the discretionary decision by school administrators in this case as to whether Daniel should have been removed from the school and disciplined. As discussed below, although *Engquist* dealt with discretionary decisions in the public employment context, its analysis and rationale clearly applies to discretionary determination by decision-makers in other contexts, such as the one in the instant case.

In *Engquist*, the Supreme Court addressed "class of one" claims and declined to apply this doctrine in the context of public employment. The *Engquist* Court reasoned that "[if] plaintiffs need not claim discrimination on the basis of membership in some class or group, but rather may argue only that they were treated by their employers worse than other employees similarly situated, any personnel action in which a wronged employee can conjure up a claim of differential treatment will suddenly become the basis for a federal constitutional claim." *Id.* at 2156. Although the *Engquist* decision was applied in the context of public employment, the analysis by the Supreme Court suggests that "class of one" challenges can only be made to non-discretionary decisions even in the non-employment context. For example, *Engquist* uses the illustration of a traffic ticket as a situation where the subjective, individualized decision does not lend itself to a class-of-one claim. *See Engquist*, 128 S. Ct. at 2154. Thus, although the Supreme Court noted that "[t]his principle applies most clearly in the employment context," the Court's analysis does not limit its findings to purely employment cases.

In fact, the situation in the instant case is closely analogous to the situation outlined by the *Engquist* Court in the traffic ticket hypothetical. In other words, the decision by defendants in this case as to which comments are so disruptive and/or inappropriate as to necessitate discipline or other action is "subjective and individualized." *Id.* Defendants are charged with "custodial and tutelary responsibility for children." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 656 (1995). Decisions that defendants make on a day-to-day basis to ensure the safety and welfare of the students under their care are necessarily discretionary ones. Because

defendants acted within their discretionary powers, plaintiffs' "class of one" equal protection claim must fail. Moreover, unlike an allegation that the decision was based on an impermissible classification such as race or gender, plaintiffs' "class of one" claim here does not invoke the fear of improper classification. Instead, as noted in *Engquist*, it simply "challenges the legitimacy of the underlying action itself" – namely, the school's decision to discipline Daniel under these circumstances. Accordingly, the analysis in *Engquist* appears to foreclose as a matter of law a "class of one" claim to the discretionary decisions at issue in the instant case. *See, e.g., United States v. Moore*, 543 F.3d 891, 901 (7th Cir. 2008) (applying *Engquist* to challenges to decisions of prosecutorial discretion and noting "a class-of-one equal protection challenge, at least where premised solely on arbitrariness/irrationality, is just as much a 'poor fit' in the prosecutorial discretion context as in the public employment context"); *Bissessur v. Ind. Univ. Bd. of Trustees*, No. 1:07 civ 1290 (SEB) (WTL), 2008 WL 4274451, at *9 (S.D. Ind. Sept. 10, 2008) (applying *Engquist* to class-of-one claim challenging the school's decision to expel plaintiff and noting "[t]he Supreme Court's rationale in *Engquist* effectively forecloses his claim").

However, because the Second Circuit has yet to decide the reach of *Engquist* outside the public employment context, this Court proceeds to analyze the merits of plaintiffs' "class of one" claim and concludes, in any event, that it cannot survive summary judgment.

b. Similarly Situated Requirement

In order to prevail on a class of one claim, the plaintiff "must demonstrate that [he was] treated differently than someone who is prima facie identical in all relevant respects." *Neilson v. D'Angelis*, 409 F.3d 100, 104 (2d Cir. 2005) (quoting *Purze v. Vill. of Winthrop Harbor*, 286 F.3d 452, 455 (7th Cir. 2002)). This requires a showing that the level of similarity between the plaintiff and the person(s) with whom he compares himself is "extremely high"-- so high (1) that "no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy," and (2) that "the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake." *Neilson*, 409 F.3d at 104-05; *Prestopnik v. Whelan*, 249 Fed. Appx. 210, 213, 2007 U.S. App. LEXIS 19612, at *4-5 (2d Cir. Aug. 16, 2007); *see also Doninger v. Niehoff*, 527 F.3d 41, 53 (2d Cir. 2008) ("[A] class-of-one plaintiff must show . . . an 'extremely high degree of similarity between [himself] and the persons to whom [he] compare[s] [himself]' in order to succeed on an equal protection claim.") (quoting *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006)); *King v. N.Y. State Div. of Parole*, 260 Fed. Appx. 375, 379-80, 2008 U.S. App. LEXIS 875, *X (2d Cir. Jan. 16, 2008) (explaining that, subsequent to *Olech*, the Second Circuit has "held that 'the level of similarity between [class of one] plaintiffs and the persons with whom they compare themselves must be extremely high.'") (quoting *Neilson*, 409 F.3d at 104); *Clubside, Inc.*, 468 F.3d at 159 ("We have held that class-of-one plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves. This showing is more stringent than that used at the summary

judgment stage in the employment discrimination context.") (citation omitted); *Pina v. Lantz*, 495 F. Supp. 2d 290, 304 (D. Conn. 2007) ("[T]he Second Circuit has left no doubt that a [class of one] plaintiff must meet a high threshold to move beyond summary judgment. Specifically, for a plaintiff to demonstrate that he or she was treated differently from similarly situated individuals in an irrational manner, in violation of the Fourteenth Amendment, the plaintiff must demonstrate that he or she is prima facie identical to the comparators.") (citation and quotation marks omitted). Further, "[g]enerally, whether two [individuals] are similarly situated is a factual issue that should be submitted to the jury." *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 790-91 (2d Cir. 2007) (noting that "rule is not absolute and a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met") (citations and quotation marks omitted); *Clubside, Inc.*, 468 F.3d at 159 (explaining that, "[g]enerally, whether parties are similarly situated is a fact-intensive inquiry," although "a court may grant summary judgment in a defendant's favor on the basis of lack of similarity of situation . . . where no reasonable jury could find that the persons to whom the plaintiff compares itself are similarly situated").

Plaintiffs point to D.A., N.C. and the allegedly unknown originator of the comment as similarly situated individuals against whom the defendants declined to take disciplinary action. Plaintiffs have failed to create a genuine issue of material fact as to whether any of these three individuals is similarly situated. As to the unidentified originator of the comment, plaintiffs have not provided the name of such individual, nor have they provided any evidence that defendants were aware of the identity of that individual. Therefore, defendants could not have disciplined the alleged originator of the comment and such individual was clearly not similarly situated to Daniel. As to N.C. and D.A., plaintiffs have put forth no evidence that anyone alleged either of those students to have been the originator of the comment. The record is clear that these students only repeated Daniel's statement, whereas there was an allegation that Daniel originated the comment, rather than merely repeating it. Therefore, plaintiffs have not put forth any evidence from which a reasonable juror could find that these students were similarly situated to Daniel. For these reasons, defendants' motion for summary judgment on plaintiffs' equal protection claim is granted.

c. Irrational and Arbitrary Basis

Assuming *arguendo* that plaintiff had put forth evidence that the other students were similarly situated to Daniel, the Court will analyze whether the record includes evidence from which a reasonable juror could find "that the defendant intentionally treated [Daniel] differently, with no rational basis." *Prestopnik*, 249 Fed. Appx. 210, 2007 U.S. App. LEXIS 19612, at *5; *see also Price v. City of New York*, 264 Fed. Appx. 66, 68, 2008 U.S. App. LEXIS 3133, at *2 (2d Cir. 2008) ("To prevail on a 'class of one' selective treatment claim without asserting membership in a protected class, Price must demonstrate, inter alia, that the defendants *intentionally* treated him differently from others similarly situated without any rational basis.") (emphasis in original); *Siao-Pao v. Connolly*, 564 F. Supp. 2d 232, 245 (S.D.N.Y. 2008) ("This Court has interpreted the *Olech* standard to require that differential treatment be both intentional and irrational to satisfy the class of one standard."). For the reasons set

forth *infra*, the Court finds that plaintiffs have not raised a genuine issue of material fact as to this element either.

As discussed above, the plaintiffs have put forth no evidence that defendants were aware of the identity of the alleged originator of the comment or that there were ever any allegations that N.C. or D.A. were the originator of the comment. Therefore, there is no basis for finding that defendants acted arbitrarily and irrationally in not disciplining an individual whose identity was not known or individuals not alleged to have participated in any inappropriate conduct. Therefore, even assuming *arguendo* that plaintiffs' equal protection claim fell within *Enquist* and satisfied the similarly situated prong, this Court grants defendants' motion for summary judgment on this "class of one" claim because no reasonable jury could find that the defendants treated Daniel differently, with no rational basis.

### B.  Ms. DeFabio and Mr. Rusinsky's Derivative Claims

Defendants contend that the derivative claims asserted in this action by plaintiffs Rusinsky and Ms. DeFabio are not available under Section 1983.  Although the Second Circuit has not decided this question, the courts that have addressed it agree with defendants.  *See, e.g., Johnson v. City of N.Y.*, No. 07 Civ. 01991 (PKC), 2008 U.S. Dist. LEXIS 60985, at *3 n.1 (S.D.N.Y. July 25, 2008) ("It is doubtful that . . . a derivative claim [under Section 1983] would state a claim for relief."); *Harrison v. Harlem Hosp.*, No. 05 Civ. 8271 (WHP), 2007 U.S. Dist. LEXIS 71908, at *11 (S.D.N.Y. Sept. 28, 2007) ("While the Second Circuit has not addressed whether a plaintiff may bring a loss of consortium claim pursuant to federal civil

rights statutes, the weight of authority holds they may not.") (collecting cases); *Kreutzberg v. County of Suffolk*, No. 04-CV-3835 (JS) (WDW), 2006 WL 3370351, at *4 (E.D.N.Y. Nov. 20, 2006) ("[T]he Second Circuit has not ruled on whether a claim for loss of consortium can be brought under Section 1983; however, all four Second Circuit district courts and the Sixth Circuit have found that a loss of consortium claim is a derivative claim that is not cognizable under Section 1983.").

In any case, the Court need not resolve this issue because the derivative claims cannot stand without the underlying Section 1983 claims and the Court has granted defendants' summary judgment motion on those claims. Therefore, defendants' motion for summary judgment as to the derivative claims is also granted.

### C.  Municipal Liability

The Court has separately examined whether the School District or the School Board itself can be held liable for the alleged violations of the individual defendants.  For the reasons set forth below, the Court concludes that summary judgment as to these entities is also warranted.

Municipalities, including school boards, cannot be held vicariously liable for the actions of an employee under § 1983.  *Monell v. Dep't of Soc. Servs.*, 463 U.S. 658, 691 (1978) ("[A] municipality cannot be held liable solely because it employs a tortfeasor – or, in other words, a muncipality cannot be held liable under § 1983 on a respondeat superior theory.").  Thus, "[a] municipality will not be held liable under Section 1983 unless the plaintiff can demonstrate that the allegedly unconstitutional action of an individual law enforcement official was taken

pursuant to a policy or custom 'officially adopted and promulgated by that [municipality's] officers.'" *Abreu v. City of N.Y.*, No. 04-CV-1721 (JBW), 2006 U.S. Dist. LEXIS 6505, at *11 (E.D.N.Y. Feb. 22, 2006) (quoting *Monell*, 436 U.S. at 690) (alteration in original). "[M]unicipal liability under § 1983 attaches where – and only where – a deliberate choice to follow a course of action is made from among various alternatives" by city policymakers. *City of Canton v. Harris*, 489 U.S. 378, 389 (1989) (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 483-84 (1986)). Thus, an individual's misconduct will not result in *respondeat superior* liability for his supervisors absent specific allegations that he acted pursuant to an official policy or custom. *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991). However, "[a] court may draw the inference of the existence of a policy or custom 'when a plaintiff presents evidence that a municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction.'" *Caidor v. M&T Bank*, No. 05-CV-297 (FSJ), 2006 U.S. Dist. LEXIS 22980, at *35-36 (N.D.N.Y. Mar. 27, 2006) (quoting *Griffin-Nolan v. Providence Wash. Ins. Co.*, No. 04-CV-1453 (FJS), 2005 U.S. Dist. LEXIS 12902, at *10 (N.D.N.Y. June 20, 2005) (quotation omitted)). But, "'the mere assertion . . . that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference.'" *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995) (quoting *Dwares v. City of N.Y.*, 985 F.2d 94, 100 (2d Cir. 1993)).

In the instant case, as the Court finds as a matter of law on summary judgment that no constitutional violation was committed against plaintiff by the individual defendants, *see*

*supra*, no *Monell* claim can lie against the District or School Board pursuant to § 1983.[17] *See, e.g., Segal v. City of N.Y.*, 459 F.3d 207, 219 (2d Cir. 2006) ("Because the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* was entirely correct."); *accord Vippolis v. Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985) ("A plaintiff who seeks to hold a municipality liable in damages under section 1983 must prove that the municipality was, in the language of the statute, the 'person who . . . subjected, or cause[d] [him] to be subjected,' to the deprivation of his constitutional rights.") (citing 42 U.S.C. § 1983); *see also Ewolski v. City of Brunswick*, 287 F.3d 492, 516 (6th Cir. 2002) ("Having concluded that the Appellant has not shown a genuine issue of material fact as to any of the asserted constitutional claims, we therefore conclude that the district court correctly dismissed the Appellant's municipal liability claims.") Therefore, to the extent plaintiff is attempting to assert a *Monell* claim against the District of School Board, the Court grants defendants' motion for summary judgment as to such claim.[18]

---

[17] In any event, summary judgment would also be warranted in favor of the School District and School Board because plaintiffs have failed to proffer any evidence of a policy, custom, or failure to train, that led to any alleged constitutional violation.

[18] Likewise, with regard to the individual defendants, to the extent that they are being sued in their official capacities, the claims against them are duplicative of the *Monell* claim against the School District and School Board. *Tsotesi v. Bd. of Educ.*, 258 F. Supp. 2d 336, 338 n.10 (S.D.N.Y. 2003) (citing *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985)); *see also Monell*, 436 U.S. at 691 (holding that "official-capacity suits generally represent only another way of pleading an action

### D. State Law Claims

Having granted summary judgment dismissing plaintiffs' federal claims under Section 1983, the only remaining claims are those arising under state law, specifically, for false imprisonment, unlawful arrest, intentional infliction of emotional distress, and violation of the Mental Hygiene Law. Under 28 U.S.C. §1367(c)(3), the Court must consider whether it should continue to exercise jurisdiction over these remaining claims. In determining whether to continue to retain jurisdiction, district courts consider factors such as judicial economy, convenience, fairness and comity. *See Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1191 (2d Cir. 1996). Although a court possesses the discretion to retain jurisdiction, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state law claims." *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003) (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)); *Baylis v. Marriott Corp.*, 843 F.2d 658, 665 (2d Cir. 1988) ("When all bases for federal jurisdiction have been eliminated from a case so that only pendent state claims remain, the federal court should ordinarily dismiss the state claims.") (quoting *Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966)).

Accordingly, pursuant to 42 U.S.C. § 1367(c)(3), the Court, in its discretion, declines to retain jurisdiction over the remaining state law claims given the absence of any federal claims that survive summary judgment, and dismisses such state claims without prejudice.

### IV. CONCLUSION[19]

For the reasons set forth above, defendants' motion for summary judgment is granted on the Section 1983 claims. Because the Court declines to exercise supplemental jurisdiction over plaintiffs' pendent state claims, they are dismissed without prejudice. The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.

_____

JOSEPH F. BIANCO
United States District Judge

Dated: October 1, 2009
Central Islip, New York

* * *

The attorneys for plaintiffs are Raymond G. Kuntz, Esq. and Leah L. Murphy, Esq. of Kuntz, Spagnuolo & Murphy, P.C., 444 Old Post Road, Bedford Village, New York 10506. The attorneys for defendants are Jeltje DeJong, Esq., David H. Arnsten, Esq. and Kelly E. Wright, Esq., of Devitt, Spellman,

---

against an entity of which an officer is an agent"). Therefore, the *Monell* claims against the individual defendants in their official capacities also do not survive summary judgment.

[19] As the Court has granted defendants' motion for summary judgment on all federal claims for the reasons discussed herein, the Court has not addressed the additional alternative grounds argued by the defendants in their papers, such as qualified immunity on the other claims, in addition to the freedom of speech claim.

Barrett, LLP, 50 Route 111, Smithtown, New York 11787.